# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| v. | ) | **CIVIL NO. 2:14-CV-521-DBH** |
| | ) | |
| **JOHN H. KIMBALL, JR., AND** | ) | |
| **KIMBALL FAMILY REALTY TRUST,** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

## DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In this federal tax lawsuit, the United States seeks two forms of relief: (1) To reduce to judgment unpaid taxes, penalties and interest that it says the individual taxpayer defendant John H. Kimball, Jr. owes the Internal Revenue Service (Count One); (2) To enforce federal tax liens for those amounts against a trust of which the defendant Kimball previously was trustee (Count Two). I **GRANT** the United States's motion for summary judgment on Count One and **DENY** it on Count Two.[1]

### COUNT ONE: THE INDIVIDUAL'S TAX LIABILITIES

On Count One, the United States has presented "Certificates of Assessments, Payments and Other Specified Matters" for each of the tax years

---

[1] I accept all of the undisputed facts. Where facts are properly disputed, I take the version most favorable to the nonmoving party. If a statement of facts is supported by record citations and not properly controverted (here the United States did not respond to the Kimball Family Realty Trust's Statement of Additional Facts), I take the statement as undisputed. See Local Rule 56(c), (f).

in question, for Kimball's personal income taxes (2001-2004, 2007-2010) and for employment taxes related to his law practice (2008-2011) for a total tax liability in the amount of $1,090,700.05.  (ECF No. 41).  Kimball has not contested the amounts due, saying only that he "is unaware of whether or when tax assessments were made and unaware of the correct amount of tax liability owed," and that he is "aware that [he] has received some notices of assessments but is unaware of whether the Plaintiff's notices so describe[d] in its Statement of Facts are accurate, complete, or the assessments which [he] has received."  Opp'n at 6-7 (ECF No. 42).  That is insufficient to resist the United States's motion for summary judgment on Count One.  The First Circuit cases are clear that these Certificates "are 'presumptive proof of a valid assessment.'  This presumption places the burden of proof on [the defendant] to show that the IRS's determination is invalid."  <u>Stuart v. United States</u>, 337 F.3d 31, 35 (1st Cir. 2003) (quoting <u>Geiselman v. United States</u>, 961 F.2d 1, 6 (1st Cir. 1992); <u>Lefebvre v. Commissioner of Internal Revenue</u>, 830 F.2d 417, 419 n.3 (1st Cir. 1987) ("It has long been the law, in this circuit and elsewhere, that the Commissioner's deficiency determination is presumed correct, and, in seeking a redetermination, the taxpayer bears the burden of proof and persuasion to show otherwise.").

In the absence of any affirmative showing by Kimball that the IRS determination is invalid, the United States's motion for summary judgment is **GRANTED** on Count One.  The United States is entitled to judgment as a matter

of law for unpaid taxes and penalties in the amount of $1,090,700.05, interest, and other statutory additions accruing from and after March 11, 2016.[2]

### COUNT TWO: TAX LIENS AGAINST THE TRUST

In 1989, Kimball, a Massachusetts resident, established under the laws of Maine the Kimball Family Realty Trust.  Kimball Family Realty Trust (Family Trust) at ¶ 12 (ECF No. 42, Ex. 3).  He named himself as Trustee and his five children as beneficiaries.  Id. at ¶ 12; Schedule of Beneficiaries (ECF No. 42, Ex. 4); Son's Dep. at 20 (ECF No. 44, Ex. 7).[3]  The purpose of establishing the Family Trust was to buy a ski condominium for his children:  "I wanted to try to get something for the kids that they would enjoy a continued benefit for.  So, I bought it full with the intention of me not owning it."  Kimball Dep. at 22 (ECF No. 44, Ex. 1).  As the original Trustee, Kimball had the power to alter or amend the trust.  Family Trust at ¶ 7.[4]  But if he actually revoked it in whole or in part, the Family Trust document provided that the portion to which the revocation was applicable must go to the beneficiaries, not to Kimball.  Id.[5]  Kimball then funded

---

[2] That is the date of the last IRS calculations.  Statement of Material Facts (SOMF) at ¶ 1 (ECF No. 41) (As noted above, the defendant qualifies this fact by stating that he is "unaware" of when the tax assessments were made or the correct amount. Def. Kimball's Opposing SOMF at ¶ 1 (ECF No. 44)); Bishop Decl. at ¶ 2 (ECF No. 41, Ex. 1).

[3] The IRS took the depositions of both the individual defendant Kimball and his eldest son, John H. Kimball, III.  To avoid confusion, I will refer to the individual defendant's deposition as "Kimball Dep." and the deposition of his son as "Son's Dep."  In response to a Rule 30(b)(6) request, the son testified on behalf of the Family Trust as a beneficiary because the trustee (his aunt) had serious health issues.  Son's Dep. at 6 (ECF No. 44, Ex. 9).  The son testified that his father created the Family Trust "to give [the children] the property.  And he felt as though a trust was the best mechanism, vehicle to do so."  Id. at 14.  The parties have not addressed whether the latter is competent testimony within the scope of a Rule 30(b)(6) designation, but it is consistent with what the father Kimball testified.

[4] "The original TRUSTEE, while TRUSTEE, shall have the power to and may, at any time and from time to time, alter, amend or revoke in whole or in part the terms and provisions of this Trust . . . ."  Family Trust at ¶ 7 (ECF No. 42, Ex. 3).

[5] "In the event that the Trust is revoked, the TRUSTEE shall transfer and pay over the trust property or the portion thereof to which said revocation is applicable to the Beneficiaries . . . ."  Id.

the Family Trust and, with the money he provided, the Family Trust purchased a ski condominium at Mt. Abram, Maine, all in 1989. Son's Dep. at 15-16. At the time, Kimball did not have any tax liability.[6] Kimball and his wife separated in approximately 1991. Id. at 13. In August of 1993,[7] Kimball resigned as Trustee in favor of his sister, a lawyer who has done a lot of trust work. Id. at 12-13. The Family Trust by its terms thereupon became irrevocable.[8] Over the years, Kimball personally paid the condominium expenses, (utilities, taxes, insurance, condo fees), which were modest. Son's Dep. at 15, 25.[9] The Family Trust did not have a bank account. Id. at 19. While the children were young and without driver's licenses, Kimball drove them to the ski condominium for

---

[6] The United States, on the one hand, "disputes that Kimball did not incur a tax liability at the time the Property was purchased," Reply at 7, n.4 (ECF No. 45), (I am not sure what "incur a tax liability" means in this context) but adds: "Nevertheless, for the purpose of this motion, the United States will assume that Kimball did not have a tax liability at that time." Id. Thus, I proceed on that assumption and do not credit the earlier assertion in its motion that:

> [F]rom at least 1988 to at least 1995, Kimball did not timely file his federal income tax return and he had a substantial federal tax liability. . . . Accordingly, the Kimball Family Realty Trust, which was created shortly after Kimball began his practice of not filing federal income tax returns was likely created as a result of Kimball's federal tax liabilities.

Mot. at 14 (ECF No. 40). The United States offers no support for the final inference of the reason for creating the Trust. I also observe that the United States has not claimed a fraudulent transfer.
[7] The record does not establish whether he had creditors at the time. Son's Dep. at 51. The United States says that Kimball failed to timely file income tax returns for years 1992, 1993, 1994, and 1995. Mary Bishop Decl. at ¶ 5. The failure to timely file for 1992 would have happened after April 15, 1993. The United States says that in 1995 a revenue officer was assigned to contact Kimball about the failure to file. SOMF at ¶ 10. (The defendant qualified part of the facts proffered by the United States in ¶ 10 but did not dispute this discrete fact. Def. Kimball's Opposing SOMF at ¶ 10 (ECF No. 44).) The returns were submitted in 1996. Bishop Decl. at ¶ 5. Kimball's Additional Facts (not disputed) say that Kimball "did not have any tax liability, tax assessments or levies resulting therefrom." Def. Kimball's Add'l Statement of Facts at ¶ 10.
[8] The trust provided for revocation only by the original trustee. Family Trust at ¶ 7. Even then, unlike the typical inter vivos revocable trust, it provided that upon revocation the trust property would be paid to the beneficiaries, i.e., not to the settlor. Id.
[9] When they were not at the ski condo (which was most of the time), the temperature was set at about 50 degrees, and the water was shut off. Son's Dep. at 25. Def. Family Trust's Add'l Statement of Facts at ¶ 14 ("nominal covering basic maintenance and expenses only") (ECF No. 42).

family vacation time.  Id. at 19, 32.[10]  Kimball did not use (or very rarely used) the ski condominium in the absence of his children, and he never rented it to others to generate income.  Id. at 17.[11]  Kimball has not visited the ski condominium since 2000-2001.  Id. at 18.

In 2010, the United States filed notices of federal tax liens against the Family Trust's ski condo in the Oxford County Registry of Deeds.  Statement of Material Facts at ¶ 6 (ECF No. 41).[12]  Those liens arose only upon the dates of the IRS assessments.  Id. at ¶ 7.[13]  The earliest such assessment is December 26, 2006.  Id. at ¶ 1.[14]  Kimball and his wife divorced in 2012, and according to the eldest son she died that year.  Son's Dep. at 13, 18.  The children, now all adults, have their own keys to the condo.  Id. at 18.[15]  Kimball "does not use the Property as a vacation home, never resided there, does not control it, and has

---

[10] The oldest son testified that he got his driver's license in 1993, but the father continued to drive the children to the condo for a time.  Son's Dep. at 21.

[11] In deposing the defendant's eldest son, the United States tried to establish that Kimball could use the property on his own, but the son insisted that was only "Theoretically, because he had the key.  But, in actuality, no."  Son's Dep. at 21, 22, 33, 41-42 (in the last page reference, the government lawyer, despite the earlier denials, posed the question: "Whenever Mr. Kimball, Jr. used the property without his children, did he pay to use that property?" and the son answered: "It was a rarity, I think, if that ever occurred.  If that did occur, what he would do was continue to contribute to the trust.").  The settlor/original trustee, himself, testified similarly: "If I have used it with the kids or a couple of times on my own, I can pay for it by paying for the taxes and the common charges and stuff, sort of like a rent."  Kimball Dep. at 19.

[12] The defendant Family Trust qualified some of the facts stated in ¶ 6 but acknowledges that the United States filed the notices against the ski condo.  Opp'n Facts at ¶ 6.

[13] The defendant Family Trust claims to be unaware of either when the assessments were made or the correct amount of tax liability.  Id. at ¶ 7.

[14] The defendant Family Trust claims to be unaware of when the assessment occurred.  Id. at ¶ 1.

[15] When the children were younger, Kimball had the key.  Son's Dep. at 21.  The record does not reveal whether Kimball still has a key.  When asked if his father still retained a key, the son testified, "My father hasn't been up there in probably since the early 00s.  He had a motorcycle accident.  When we were younger, he would take us up there.  But, I think, the last time he was probably up there might have been 2000, 2001."  Id. at 18.

not been to the Property in nearly 16 years." Def. Family Trust's Add'l Statement of Facts at ¶ 11 (ECF No. 42).[16]

The United States's argument for relief on Count Two is straightforward. The United States argues that when unpaid taxes are assessed, a federal tax lien "attaches to all property and rights to property the taxpayer then holds or subsequently acquires. To satisfy a taxpayer's tax liability, the IRS may collect from assets held in the name of a nominee of the taxpayer." Mot. at 10-11 (ECF No. 40). The United States argues that the Family Trust is holding the ski condominium as Kimball's nominee and that the IRS should be able to enforce its tax liens on the condominium for Kimball's personal tax liabilities. Id. at 11. It has not argued that the creation or funding of the Family Trust was a fraudulent transfer.

But while the United States's argument is straightforward, the proper analysis of who or what is a nominee for federal tax lien purposes is complex. The term "nominee" does not originate in the Internal Revenue Code, but (like "alter ego") in various court decisions.[17] The usual reference is to G.M. Leasing

---

[16] Because the United States did not respond to the Additional Statement of Facts, I take this as undisputed.

[17] "There is no direct statutory authority for nominee liens. Sections 6321 and 6322 are the statutes that support the creation of federal tax liens; they do not, however, refer to nominee liens . . . . The Supreme Court in GM Leasing and other decisions ha[s] sanctioned the use of nominee liens." William D. Elliott, Federal Tax Collections, Liens, & Levies at ¶ 9.10[1] (2016). See generally Stephanie Hoffer et al., To Pay or Delay: The Nominee's Dilemma under Collection Due Process, 82 Tulane L. Rev. 781, 806-21 (2008). The Internal Revenue Manual states the following about nominees:

> (1) A "nominee" is someone designated to act for another. As used in the federal tax lien context, a nominee is generally a third-party individual who holds legal title to property of a taxpayer while the taxpayer enjoys full use and benefit of that property. In other words, the federal tax lien extends to property "actually" owned by the taxpayer even though a third party holds "legal" title to the property as nominee. Generally speaking, the third party in a nominee situation will be either another individual or a trust.

6

<u>Corp. v. United States</u>, 429 U.S. 338 (1977).  There, the Supreme Court observed that under 26 U.S.C. § 6321, the assessments against a taxpayer "were a lien in favor of the United States upon all property belonging to [the taxpayer].  If petitioner was [the taxpayer's] alter ego, . . . [i]t would then follow that the Service could properly regard petitioner's assets as [the taxpayer's] property subject to the lien under § 6321 . . . ."  <u>Id</u>. at 350-51.  But in <u>G.M. Leasing</u>, the Court explicitly avoided deciding whether the petitioner in that case *was* the taxpayer's alter ego, observing that its grant of certiorari did not include that question and that it accepted for purposes of the decision that the petitioner was the taxpayer's alter ego without deciding the issue.  <u>Id</u>. at 351.

---

(2) A nominee situation generally involves a fraudulent conveyance or transfer of a taxpayer's property to avoid legal obligations.  To establish a nominee lien situation, it must be shown that while a third party may have legal title to the property, it is really the taxpayer that owns the property and who enjoys its full use and benefit.  If state law is undeveloped or underdeveloped as to the issue of nominee ownership, contact Area Counsel for assistance.

(3) No one factor determines whether a nominee situation is present, but a number of factors taken together may.  The following list is neither exhaustive nor exclusive, but nominee situations typically involve one or more of the following:

(a.) The taxpayer previously owned the property.

(b.) The nominee paid little or no consideration for the property.

(c.) The taxpayer retains possession or control of the property.

(d.) The taxpayer continues to use and enjoy the property conveyed just as the taxpayer had before such conveyance.

(e.) The taxpayer pays all or most of the expenses of the property.

(f.) The conveyance was for tax avoidance purposes.

Internal Revenue Manual § 5.17.2.5.7.2 (2016).  "The Internal Revenue Manual . . . is a compilation of instructions promulgated by the Internal Revenue Service for the guidance of its employees when administering the tax laws."  Archie W. Parnell, Jr., <u>The Internal Revenue Manual: Its Utility and Legal Effect</u>, 32 Tax Lawyer 687 (1978).  "[T]he Manual should not be considered to be binding on the courts or the Service but merely a guide for the interpretation and execution of the Code."  <u>Id</u>. at 696-97.

[P]rocedural rules [in the Manual] are "directory" instructions to IRS employees designed to promote efficient administration; and this means that taxpayers derive no legal rights from an IRS employee's breach of instructions and cannot compel compliance.  If, however, a particular rule is intended to confer procedural rights on taxpayers (a "mandatory" rule) or if the failure to comply is arbitrary, the courts sometimes undertake to compel IRS compliance.

Martin J. McMahon & Lawrence A. Zelenak, <u>Federal Income Taxation of Individuals</u> ¶ 46.01[3] (2016).

In <u>United States v. Craft</u>, 535 U.S. 274 (2002),[18] the Supreme Court described how to decide whether property, or rights to property, belong(s) to a taxpayer for purposes of the federal tax lien statute, 26 U.S.C. § 6321:

> [It] is ultimately a question of federal law.  The answer to this federal question, however, largely depends upon state law.  The federal tax lien statute itself "creates no property rights but merely attaches consequences, federally defined, to rights created under state law."  Accordingly, "*[w]e look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation.*"

<u>Id</u>. at 278 (emphasis added) (internal citations omitted); <u>accord</u> <u>Drye v. United States</u>, 528 U.S. 49, 58 (1999).  In assessing "nominee" status in a trust case, the First Circuit likewise starts with state law, <u>see</u> <u>Dalton v. Commissioner</u>, 682 F.3d 149, 157 (1st Cir. 2012).  In <u>Dalton</u>, the First Circuit stated that "[i]n connection with real property, Maine recognizes the nominee doctrine.  This doctrine allows for the possibility that the true owner of a parcel of land may be someone other than the record owner."  <u>Id</u>.  The First Circuit referred to a single Maine Law Court decision, <u>Atkins v. Atkins</u>, 376 A.2d 856 (Me. 1977), as invoking a three-factor test, and said that "Maine case law does not fully delineate the contours of the nominee doctrine."  682 F.3d at 157.  But in <u>Dalton</u>, the First Circuit explicitly did not "determine whether the IRS applied the correct rule of law" in that Maine-law case, <u>id</u>., because the only issue was whether the IRS acted reasonably in its rejection of a minimal settlement proposed in a Collection Due Process appeal by the taxpayers.  <u>Id</u>. at 157-59; <u>See generally</u>

---

[18] In <u>Craft</u> the issue was whether a tenant by the entirety possessed property or rights to property to which a federal tax lien could attach.  The Court concluded that the answer was yes.

Adam M. Cole, Note, <u>A Preference for Deference: The Benefits of the First Circuit's</u> <u>Customized Standard of Review for Collection Due Process Appeals in Dalton v.</u> <u>Commissioner</u>, 58 Vill. L. Rev. 239 (2013).  In evaluating IRS reasonableness in <u>Dalton</u>, the First Circuit also described what courts other than Maine's do in determining a nominee relationship, describing them as "balancing a series of factors."  <u>Id</u>. at 158.[19]

Unlike <u>Dalton</u>, I must actually decide the Maine law issue here.  In doing so, I look at <u>Atkins</u>, a more recent Maine decision, <u>MERS v. Saunders</u>, 2010 ME 79, 2 A.3d 289, and other Maine law sources in deciding what rights Kimball has in the ski condominium.

First, I consider Maine trust law.  When Kimball created this Family Trust, when he resigned as trustee, and when he last visited the ski condo, Maine had not yet adopted the Uniform Trust Code.  During all this time, Maine trust law was governed by the "modest" provisions of the Maine Uniform Probate Code's Article VII "Trust Administration"[20] and the decisions of the Maine Law Court. The Maine Uniform Probate Code provided limited rules regarding registration of

---

[19] <u>Berkshire Bank v. Town of Ludlow</u>, 708 F.3d 249 (1st Cir. 2013), is another First Circuit case dealing with nominee status in the context of a federal tax lien.  But for the most part it provides no precedential value here because, as the First Circuit explicitly noted, the parties never argued the state law component of determining what rights a nominee had.  The First Circuit

> therefore assume[d], without deciding, that [the taxpayer] had an adequate interest in the . . . property under Massachusetts law, because [the competing creditor] has waived any claim to the contrary.  We will also assume, again because [the competing creditor] has not argued otherwise, that it was appropriate for the district court to apply the federal nominee test.

<u>Id</u>. at 252.  (<u>Berkshire Bank</u> was a case where the documents clearly denominated the other entity as "nominee."  <u>Id</u>. at 250.)  Nevertheless, one statement does seem to create nominee law for this Circuit: "The ultimate inquiry in a nominee case 'is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership.'"  <u>Id</u>. at 254. (quoting <u>Holman v. United States</u>, 505 F.3d 1060, 1065 (10th Cir. 2007).  I address that test at the end of this Order.
[20] <u>See</u> 18-B M.R.S.A. (2015) Uniform Gen. Cmt. Prefatory Note: "Article VII, although titled 'Trust Administration,' is a modest statute, addressing only a limited number of topics."

trusts (18-A M.R.S.A. §§ 7-101 – 7-105), the jurisdiction of courts concerning trusts (18-A M.R.S.A. §§ 7-201 – 7-206), the duties and liabilities of trustees (18-A M.R.S.A. §§ 7-301 – 7-307), and the powers of trustees (18-A M.R.S.A. §§ 7-401 – 7-408).  However, the Maine Uniform Probate Code was silent regarding the rules on drafting trusts or even what types of trusts could be created.

But there is no question that the Maine Law Court recognized the type of inter vivos trust that Kimball created in 1989.  The law on "gifts by declaration in trust" was already "well established in this state." Rose v. Osborne, 180 A. 315, 317 (Me. 1935).  "It is not essential . . . that the donor should part with the possession in the cases where he . . . declares a trust." Bath Savings Inst'n v. Fogg, 63 A. 731, 733 (Me. 1906) (quoting approvingly Pomeroy's Equitable Jurisprudence).  "The mere fact that the settlor appoints himself trustee and retains powers to revoke the trust and to use the trust corpus for his own benefit during his lifetime is not in itself a sufficient basis for regarding an inter vivos trust as incomplete . . ." Staples v. King, 433 A.2d 407, 410 (Me. 1981) (citing Restatement (Second) of Trusts § 26, cmt. h) (Am Law Inst.).  "[R]eservation of the power of amendment or revocation" does not "alter our conclusion that the children's interests vested." First Nat. Bank of Bar Harbor v. Anthony, 557 A.2d 957, 959 (Me. 1989).  Moreover, in the case of trust bank accounts, neither additional deposits nor withdrawals of earned interest by the trustee extinguished the trust.  Cazallis v. Ingraham, 110 A. 359, 362 (Me. 1920).

Before Maine enacted the Uniform Trust Code, the presumption in Maine was that a trust was irrevocable unless it stated otherwise.  See Rose, 180 A. at 318 ("Where the word 'trustee' appears on a bank book, indicating that it is a

trust fund, there is raised the presumption that an irrevocable trust was intended and is sufficient proof of it in the absence of other controlling proof."). In this case, the Family Trust document states clearly that the trust is revocable, but with two important caveats: first, only the Original Trustee can revoke the trust and, second, if he does so, the portion of the trust property to which the revocation is applicable goes to the beneficiaries outright.[21] Under no condition does the property revert to Kimball, the Settlor.  Thus, this Family Trust is unlike the typical revocable trust (and trusts created under Maine's later adoption of the Uniform Trust Code) where a settlor retains the unrestricted right to revoke for his own benefit and, as a result, creditors can execute against the trust assets.   18-B M.R.S.A. §§ 602(1), 505(1)(A).[22]   There is no suggestion on the summary judgment record that Kimball failed to establish a valid trust under Maine law or that his resignation and the appointment of a successor trustee were invalid.  As a result, under this trust instrument, after Kimball's resignation in 1993, the Family Trust could not be revoked, even for the benefit of the beneficiaries.[23]   "If a[n irrevocable] trust be created, no later act of the donor, whether impulse by good or by bad, can destroy it."  Cazallis, 110 A. at 361.

---

[21] See notes 4 and 5, supra.

[22] Maine's adoption of the Uniform Trust Code reversed the presumption of irrevocability.  The Maine Uniform Trust Code states: "Unless the terms of a trust expressly provide that the trust is irrevocable, the settlor may revoke or amend the trust.  This subsection does not apply to a trust created under an instrument executed before July 1, 2005."  18-B M.R.S.A. § 602 (2015); Uniform Cmt. ("Subsection (a), which provides that a settlor may revoke or modify a trust unless the terms of the trust expressly state that the trust is irrevocable, changes the common law."). 18-B M.R.S.A. § 505(1)(A) states: "During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

[23] By its terms, it now expires twenty years after Kimball dies.  Family Trust at ¶ 10.

11

I turn next to Maine law on nominees.  Atkins was not a trust case, but a case where a divorced spouse was seeking her spousal share of a piece of real estate that had been paid for by her husband and titled in the name of her son. 376 A.2d at 858.  Atkins did not use the term "nominee," but dealt with whether the husband was the equitable owner, such that the wife was entitled to a spousal share of the property.  Id. at 859.  In reversing the trial court's summary judgment ruling against her, the Maine Law Court pointed to the facts that the husband had furnished the down payment, taken depreciation for the property on his own income tax return, and paid the taxes and insurance on the property through a company that he owned: "Whether these facts are sufficient to warrant a finding that [the husband] was, in fact, the beneficial owner was a question for the jury."  Id.[24]

Does the summary judgment record viewed in the light most favorable to the Family Trust, the nonmoving party, demonstrate that as a matter of law Kimball was the "beneficial owner" of the ski condo under Atkins?  I conclude that it does not.  First, it is "standard common-law doctrine" that a trustee holds a "nonbeneficial" ownership and that it is the beneficiaries of the trust who hold beneficial interests or equitable title while the trustee ordinarily "holds 'bare' legal title."  Restatement (Third) of Trusts § 42 and cmts. a, c. (Am. Law Inst.)[25]

---

[24] Apparently that is the source of what the Dalton court called the three-part test.

[25] The Maine Law Court has consistently cited the Restatement of Trusts as persuasive authority in deciding matters of trust law.  See, e.g., Estate of Wilde, 1998 ME 55 ¶ 8, 708 A.2d 273, 278 ("[W]e conclude that the Restatement of Trusts best articulates the proper measure of damages for a trustee's breach of fiduciary duty."); Newick v. Mason, 581 A.2d 1269, 1272 (Me. 1990) (citing the Restatement of Trusts as persuasive authority for trust construction); Louisa T. York Orphan Asylum v. Erwin, 281 A.2d 453 (Me. 1971) (citing an official comment in the Restatement of Trusts for a "universally accepted rule"); Swasey v. Chapman, 156 A.2d 395, 417 (Me. 1959).  When a trust is irrevocable, creditors can only reach trust property of the settlor "that can be

12

Such labels of course are not determinative in assessing Kimball's rights in the Family Trust property.  But second, under the terms of this Family Trust, Kimball was not a beneficiary and, although he had power to revoke the trust before he resigned in 1993, such a revocation could not benefit him.  It could only transfer title immediately to the beneficiaries.  It is true that Kimball furnished the money to buy the ski condominium (like Atkins), and paid the real estate taxes and insurance (like Atkins), but there is no evidence that he treated the property as his own on his federal income tax return (unlike Atkins).[26] Moreover, by the time the earliest assessment in question was made (December 2006), the trust was irrevocable, Kimball was no longer trustee, he had not visited the Family Trust property in five years, and the beneficiaries were adults.[27]  At best, then, whether Kimball "was, in fact, the beneficial owner [is] a question for the jury."  Atkins, 376 A.2d at 859.

---

distributed for the settlor's benefit."  18-B M.S.R.A. § 505(1)(B); Restatement (Third) of Trusts § 42 cmt. C (Am. Law Inst.).  That may explain why earlier bankruptcy and divorce proceedings against Kimball did not reach the Trust or the ski condo (according to the Family Trust's Additional Statement of Facts at ¶¶ 16, 18, which were not disputed).  But the Additional Statement says only that "it was determined" during the proceedings, not differentiating whether the court determined or whether one or more parties simply decided to proceed on that basis.  I have not been able to verify that assertion independently because the reported bankruptcy decisions do not mention it.  In re Kimball, No. 99-13592-WCH, 2001 WL 260078 (Bankr. D Mass. Jan. 18, 2001), aff'd, No. 99-13592-WCH, 2002 WL 441986 (D. Mass. Feb. 27 2002).  (The Trust has not referred to a specific document or transcript of the bankruptcy proceedings to support the assertion).  I also do not have access to the Massachusetts divorce proceedings.  The United States says that the IRS was a creditor in Kimball's chapter 11 proceedings, but does not tell me whether it obtained any assets or whether it attempted then to reach the trust property. Bishop Decl. at ¶ 5.

[26] The defendant Family Trust claims the contrary, that Kimball "never listed the parcel as depreciable property on his income tax return."  Opp'n. at 16 (ECF No. 42).  But it provides no record support for the assertion.  Moreover, one might wonder why Kimball would list it as depreciable if it was not income-producing property.  More pertinent would be whether Kimball took a deduction on his personal return for the ski condo real estate taxes he paid, but that is not revealed on this record.

[27] The son testified that his youngest sibling, Luke, was five years old in 1993, Son's Dep. at 21, which would make him at least 18 years old by December of 2006.

MERS also was not a trust case, but a mortgage case where the mortgage documents explicitly denominated Mortgage Electronic Registration Systems "solely as the 'nominee' to the lender." 2010 ME 79 at ¶ 9. The Maine Law Court stated: "A nominee is a 'person designated to act in place of another, usu[ally] in a very limited way,' or a 'party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others.'" Id. at ¶ 10. Kimball, no longer the trustee, does not fit the definition of a "person designated to act in place of another." Kimball's sister as trustee does hold "bare legal title for the benefit of others," but here the "others" are not Kimball the trust settlor and taxpayer but are instead the trust beneficiaries, Kimball's adult children. Like Atkins, the MERS definition of nominee does not entitle the United States to summary judgment that Kimball currently has a property interest under Maine law in the Trust assets.

So what is the basis for ignoring the Family Trust here as an entity separate from Kimball? The United States presents the following grounds for finding nominee status:

1.   Kimball, as donor/settlor/trustee of the Kimball Trust, provided the funds for the purchase of the Property, as in Dalton and Berkshire Bank. See Kimball III (30(b)(6) Deponent for the Trust), Depo. p. 20:14-22; p. 48:3-6 (hereinafter, "Kimball III Depo."), attached hereto as Exhibit 1.

2.   Even though Kimball had served as the trustee of the Kimball Trust, until being replaced by his sister, neither Kimball's sister nor the Kimball Trust paid Kimball any consideration for the Property, as in Dalton. Kimball III Depo. p. 48:7-24.

3.   Kimball makes all payments for the Property's upkeep, including condominium fees, utilities, and

real estate taxes, as in <u>Dalton</u>. Kimball III Depo. p. 19:7-20.

4.      Kimball uses or has used the Property as a family vacation home, indicating that he treated it as his own, as in <u>Dalton</u> and <u>Berkshire Bank</u>. Kimball III Depo. p. 48:7-24.

5.      The beneficiaries of the Kimball Trust are the [sic] Kimball's children, as in <u>Dalton</u>.

6.      No one, other than Kimball, would take the children, *i.e.*, the beneficiaries of the Property, which establishes that Kimball was in control of the Property, as in <u>Dalton</u> and <u>Berkshire Bank</u>.

7.      The Kimball Trust itself habitually has operated with minimal attention to records or other *indicia* of independent existence, as in <u>Dalton</u> and <u>Berkshire Bank</u>.

8.      Kimball hand-picked the present trustee, who is a [sic] Kimball's sibling, as in <u>Dalton</u>.

9.      Other than the trust agreement itself, Kimball and the Kimball Trust have no written lease or other documentation of their asserted relationship, as in <u>Dalton</u>.

10.     The Kimball Trust does not have a separate bank account apart from Kimball himself, as in <u>Berkshire Bank</u>.

11.     The relationship between the Kimball Trust and Kimball, himself, could not be closer; no one other than Kimball's sister (or children) had any interest in the Property, made decisions for the Kimball Trust or benefited from the Kimball Trust, as in <u>Berkshire Bank</u>.

12.     Although Kimball claims that he did not have a tax liability when the Kimball Trust was initially formed – which, coincidentally, was formed one day prior to the purchase of the Property – Kimball later incurred a significant tax liability, as in <u>Berkshire Bank</u>.

13.     The defendants admit that if the trust agreement did not exist, the Property itself would simply be Kimball's family vacation home. This factor plainly indicates that the Kimball Trust is nothing more than a proxy for Kimball, as in <u>Dalton</u> and <u>Berkshire Bank</u>.

Reply at 8-9 (ECF No. 45) (footnote omitted).[28]

Some of these assertions are typical of any inter vivos trust (funds donated; no consideration; children as beneficiaries; trustee designating a successor). They must be weighed cautiously in assessing nominee status. Creation of inter vivos trusts is a longstanding and widespread estate planning technique, Restatement (Third) of Trusts § 25 cmt. A (Am. Law Inst.), used often when beneficiaries are young. It is not uncommon for settlors to act as their own trustees initially. Id.[29] Since the IRS is not charging Kimball with fraudulent

---

[28] The classic listing of factors is Towe Antique Ford Foundation v. IRS, 791 F. Supp. 1450, 1454 (D. Mont. 1992) ("(a) No consideration or inadequate consideration paid by the nominee; (b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property; (c) Close relationship between transferor and the nominee; (d) Failure to record conveyance; (e) Retention of possession by the transferor; and (f) Continued enjoyment by the transferor of benefits of the transferred property."), quoted in Oxford Capital Corp. v. United States, 211 F.3d 280, 284 n.1 (5th Cir. 2000). Towe "was the first decision to amalgamate factors used in other courts' decisions." Stephanie Hoffer et al., To Pay or Delay: The Nominee's Dilemma Under Collection Due Process, 82 Tul. L. Rev. at 809. Reaching beyond Maine law, the First Circuit identified these factors in Dalton:

> Almost universally, courts weigh the existence of a nominee relationship by balancing a series of factors, including but not limited to whether the consideration paid by the putative nominee was adequate, whether the property was transferred in anticipation of liability, whether a close relationship exists between the transferor and putative nominee, whether the transferor retains possession and/or use of the property notwithstanding the transfer, and whether the transferor continues to enjoy the benefits of the property. Courts also have viewed as relevant whether the transferor furnishes the funds used to purchase the property, whether the transferor is providing the wherewithal needed to maintain the property post-transfer, and whether the transferor continues to treat the property as his own. Virtually without exception, courts focus on the totality of the circumstances without regarding any single factor as the sine qua non of a nominee relationship.

Dalton v. Commissioner, 682 F.3d 149, 158 (1st Cir. 2012) (citations omitted). I note that even if the contours of Maine's nominee doctrine are so inconclusive that it is necessary to apply the general common law factors summarized by the First Circuit in Dalton, the United States still would not be entitled to summary judgment on this record.

[29] It is true that as long as an inter vivos trust is revocable, it is customary to treat the trust property "as if it were property of the settlor and not of the beneficiaries," Restatement (Third) of Trusts § 25 cmt. a (Am. Law Inst.), because the settlor retains complete control over the property until the trust is revoked or the settlor dies. Id. Therefore it is subject to the claims of creditors of the settlor. Id. cmt. c. The Maine Uniform Trust Code applies this rule at 18-B M.R.S.A. § 505(1)(A). But the Family Trust became irrevocable when Kimball resigned in favor of his sister

16

transfers, nothing prevented him in 1989 from making an outright gift to others or, in this case, a gift in trust for the benefit of his children so that the ski condo could ultimately pass to them without going through probate. See id. Under the terms of the Family Trust, Kimball could not revoke it for his own benefit. Upon his resignation in 1993 it became altogether irrevocable,[30] and Kimball has not been present at the ski condominium since 2001.

But other assertions in the list above—for example, the lack of a trust bank account, Kimball's payment of expenses from his personal account, Kimball's manner of using the ski condo, his contested tax status at the time he created the trust (although I do not consider his tax status on the summary judgment record, the United States might be able to prove at trial that Kimball was in tax jeopardy)—might persuade a factfinder that the Family Trust was and remains a fiction and that Kimball treated the ski condo as his own. According to Berkshire Bank v. Town of Ludlow, "[t]he ultimate inquiry in a nominee case 'is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership.'" 708 F.3d 249, 254 (1st Cir. 2013) (quoting Holman v. United States, 505 F.3d 1060, 1067-68 (10th Cir. 2007)). The nominee issue is fact-intensive and, according to Dalton, involves the "totality" of the circumstances. 682 F.3d at 158.

---

as trustee, and even while it was revocable, only the beneficiaries (not Kimball) could obtain property resulting from revocation.

[30] The United States has not argued that in 1993 Kimball made a fraudulent transfer by making it irrevocable.

Returning to the <u>Craft</u> standard, then, on this summary judgment record, I cannot say as a matter of law that after Kimball resigned as Trustee in 1993 he personally had "state-delineated rights" in the Family Trust property that would "qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation."  535 U.S. at 278.  A factfinder could find that, before any tax lien arose with respect to the property, the combination of Kimball's resignation as trustee, the trust becoming irrevocable, the adulthood of the beneficiaries, and Kimball's having no further presence at the ski condo, resulted in his having no state-delineated rights to the property.

Accordingly, the United States's motion for summary judgment on Count Two is **DENIED**.

**SO ORDERED.**

**DATED THIS 24TH DAY OF JUNE, 2016**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

18